# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 20, 2010 Session

### STATE OF TENNESSEE v. DAVID NEAL DAVIS

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-61446      Don Ash, Judge**

---

### No. M2009-00691-CCA-R3-CD - April 19, 2011

---

Defendant, David Neal Davis, was originally indicted by the Rutherford County Grand Jury on four counts of aggravated sexual battery and one count of attempt to commit aggravated sexual battery. In a trial on these charges, Defendant moved for a mistrial, after the victim testified that she had been digitally penetrated by Defendant. The trial court granted Defendant's motion for a mistrial. In a superceding indictment, Defendant was indicted on two counts of rape of a child, eight counts of aggravated sexual battery, one count of solicitation of a minor, and one count of attempted aggravated sexual battery. Following a jury trial on these charges, Defendant was convicted of rape of a child, attempted rape of a child, seven counts of aggravated sexual battery, two counts of child abuse, and one count of attempted solicitation of a minor. He was sentenced by the trial court to an effective sentence of twenty years confinement. In this appeal as of right, Defendant asserts the following errors by the trial court: 1) the trial court erred by failing to dismiss the indictment on the basis of double jeopardy, or alternatively, on the basis of prosecutorial misconduct; 2) the trial court erred by denying Defendant's motion to introduce evidence of specific instances of sexual conduct by the victim; 3) the trial court erred by failing to dismiss Counts five and seven of the indictment, charging aggravated sexual battery, based on the State's failure to prove venue in those counts; and 4) the trial court erred by failing to dismiss Count one of the indictment, charging rape of a child, based on the State's failure to prove an element of the offense. After a thorough review of the record and the briefs of the parties, we find no error and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellant, David Neal Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Laural A. Hemenway, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### *Facts*

The victim was 14 years old at the time of trial. She testified that all of the incidents that were the basis of the 12-count indictment occurred when she was age 12 or younger. She testified that the first incident occurred at her home in Rutherford County before Christmas when she was in kindergarten. She was lying down in a chair, almost asleep, watching a movie. Defendant kneeled next to her and began to rub her back on top of her clothes. He then rubbed her breasts on top of her clothes. The victim testified that she felt "weird and a little bit sad" about the incident.

The victim did not tell anyone about the incident until one year later. She testified that she was lying in bed with her mother and brother, reading a book about "telling the truth and not never [sic] telling lies." That's when the victim told her mother that Defendant had abused her. The victim testified that her mother cried. After her disclosure to her mother, the victim was sent to therapists and counselors. The victim testified that Defendant told her that if she would tell her mother that it was a dream, "everything [would] go away."

The victim testified that when she was in the fourth grade, "[the incidents] started to happen again slowly. But it picked up again." The next incident, about which she testified, happened while she was riding in the car with Defendant. She testified that Defendant put his hand down the front of her shirt and touched her breasts while they were in the car.

The victim testified that the next incident also happened when she was in the fourth grade. She testified that she was in the living room of her home, playing a Disney game on a laptop computer. Defendant sat next to her on the couch and began to kiss her neck. It was nighttime. Defendant then stood up, closed the curtains and took the laptop from her. He turned out the lamps and kneeled beside her. She testified that Defendant began rubbing her back and asked, in a whisper, if he could kiss her vagina. The victim shook her head and turned away from him. She testified that her mom came home, and Defendant jumped up. The victim also jumped up and ran to her bedroom. The victim testified that she did not tell anyone about that incident because she "was scared . . . and didn't want anyone to not [sic] believe [her]."

Next, the victim testified that when she was in the fourth or fifth grade, she was riding in a vehicle with Defendant, and he put his hand down her shirt again and touched her breasts. She put her feet in the seat, with her knees up against her, so that he would not do it again. She testified that around the same time as that incident occurred, another incident occurred at her home. The victim was using the computer to create a "Xanga" page, which is a personal website. She testified that she went to her bedroom, turned off the lights, and changed into her pajamas. She was lying in bed when Defendant came into her room and began rubbing her back and her chest. The victim testified that she had layered her clothing for "protection" against Defendant's touching her. She recalled that Defendant's "hands were really big" and that he "usually smelled of smoke." She testified that Defendant touched her breasts under her clothes and her "private area" on top of her clothes.

The next incident occurred when the victim was in the fifth grade. She had just been nominated to travel to Europe with the People to People Student Ambassador Program. She received a letter from the program dated November 4, 2005. She testified that she was sleeping in her bed, and the lights were out. Defendant came into her room and began to rub her back over her clothes and then under her clothes. Defendant then rubbed her "butt" and her chest under her clothes and her vagina under her clothes. The victim testified that Defendant "rubb[ed] up and down" on the "surface" of her vagina. She testified that this incident was "memorable" because it was the first time that Defendant had rubbed her vagina under her clothes. The victim testified that she felt "sad" and "embarrassed and violated." She did not tell anyone about the incident because she "didn't want there to be huge problems if [she] told." She also testified that she "didn't want to make anything worse than it already was."

The next incident occurred when the victim was in the fifth or sixth grade. She testified that she was watching television in the "rec room" and she fell asleep on the couch. She testified that Defendant picked her up and carried her to the stairs. She smelled beer on Defendant's breath. She asked Defendant to put her down, and he did. She testified that Defendant followed her upstairs and came into the room she was in. He began rubbing her back and her breasts under her clothes. He then rubbed her vagina, again on the "surface," but under her clothes. She testified that Defendant did not "go into" her vagina.

The next incident occurred when the victim was in the sixth grade. She recalled that it was the night before TCAP tests. Defendant picked her up and carried her for a distance until she had him set her down. Defendant rubbed her back first, and then began rubbing her "private parts" under her clothes as he had done previously. She testified that he did "the same sorts of things that he had been doing."

The victim testified about another incident that occurred while she was in the sixth grade, before she traveled to Europe, when Defendant rubbed her back and put his hand in her underwear. She testified that he tried to put his finger inside her vagina, but she moved away. Defendant immediately left.

Defendant wrote letters to the victim while she was in Europe from late June to mid-July, 2006, in which Defendant wrote that he "think[s] about [the victim] constantly" and that he was "still missing" her.

The next incident occurred after the victim returned from her trip to Europe. She testified that she had been making beaded necklaces. She testified that Defendant laid "on top" of her. Defendant "put his hand on [her] hand" and "rubb[ed] himself up and down, but he was wearing clothes." The victim had blankets over her head, but she testified, she "felt on [her] bottom his privates touching [her] privates, but through the . . . blankets and clothes." Then, Defendant got up and left. She testified that the incident was "scary" and "really embarrassing." She testified, "I didn't know how far things would go and what would be taken to a certain level. I didn't know when it was going to stop. I don't exactly know how I felt besides feeling sad and embarrassed and upset."

The next incident about which the victim testified, which is the basis for Count 1 of the indictment, occurred at the beginning of her seventh grade year. She testified that Defendant kneeled beside her and put his finger inside her vagina. She testified that it "hurt very badly," and she "felt very violated." She described it as the "worst" incident.

The last incident occurred within a week or two before Labor Day. The victim did not testify which year it occurred, but it appears from the record, that it was in 2006. She testified that while in Europe, she "tried to make a plan in [her] head to have this stopped and to have this not happen . . . anymore." The night of the last incident Defendant began rubbing her back. The victim's mother came into the room, and Defendant "jumped up."

Two days after that incident, the victim's mother asked her about the abuse, and the victim told her mother that Defendant had abused her. The victim testified that she was embarrassed and cried and that her mother cried also. The victim testified that she had not disclosed the abuse to anyone before because she did not want to create "huge problems." The victim interpreted certain statements by Defendant as threats against her if she told about the abuse. The victim testified that "if [she] had known what would happen if [she] did tell, [she] would have told many years ago."

In September 2006, Carolyn Smeltzer was employed as a nurse at Our Kids Center through Vanderbilt Medical Center. She testified that she examined the victim at Primary

-4-

Care and Hope Clinic, an "outreach clinic" in Rutherford County on September 12, 2006. The victim was referred to Our Kids on August 30, 2006, and the appointment was scheduled by the victim's mother.

Ms. Smeltzer testified that she was certified as an expert in the medical evaluation of child sexual abuse. She testified that she had examined approximately 900 children prior to examining the victim in this case. She further testified that between 50 and 75 percent of the children examined had reported digital penetration and that in only one percent of those cases was there any evidence of injury to the victim. Ms. Smeltzer recalled one or two cases that revealed medical findings, and those cases were "acute" cases where "the touching [had] just happened within the last . . . 24 to 48 hours." The victim's exam was "normal," which meant she found no evidence of injury in the victim's exam. A rape kit was not performed on the victim because, Ms. Smeltzer testified, there was no indication that any forensic evidence would have been collected as the last reported sexual contact had been two weeks prior to the examination.

The victim was interviewed by social worker Lisa Dupree prior to the exam and a report was prepared. The report indicated that the victim stated that Defendant had touched her on her breasts and her genitals and that the abuse happened "maybe once a week." The victim also stated that "[Defendant] really didn't go inside my private. Well, maybe one time he did."

The interviewer also spoke to the victim's mother. The report states that the victim's mother reported that the victim had been evaluated six years earlier, but that the "MDCS investigation suggested there was not enough evidence to make a finding of sexual abuse." She also stated that "she ha[d] not slept in six years because she [was] always getting up to check on [her daughter]." One day, she questioned her daughter, asking her if Defendant had done "anything to make her feel uncomfortable." The victim told her mother that Defendant "sometimes rubs her back" and that she "did not like [Defendant] to rub her back because he creeps her out." The victim then told her mother that Defendant also "rub[bed] her thighs and her bottom," and the victim began to cry. Her mother asked her if Defendant "touched her in a place where he was not supposed to touch her." The victim responded, "What do you think?" and continued to cry. The victim told her mother that she was embarrassed. She then pointed to her breasts and told her mother that Defendant touched her breasts. Her mother asked if Defendant touched her on any other part of her body, and the victim responded, "What do you think?" The victim continued to cry and would not answer any more of her mother's questions.

The report also indicated that the victim had been seen by Our Kids six years prior to the interviews, following the first allegations that Defendant had abused her, but the

-5-

report noted that the earlier allegations were "unfounded." Ms. Smeltzer testified that "unfounded is a term that DCS and the authorities use to basically say that they don't have enough information to say that something happened."

The victim's mother testified that one night before bed, she and the victim and her oldest son were lying in her bed, and she was reading a book to them. The book prompted a discussion between them about "good secrets" and "bad secrets." The victim then told her mother that Defendant had touched her and demonstrated by rubbing her hand from her abdomen down to her genital area. The victim told her mother that Defendant had touched her there. She confronted Defendant, and Defendant denied the allegations. She testified that she "didn't know what to believe."

Following the victim's disclosure, her mother took her to see a psychologist and a pediatrician. The victim's mother felt "very conflicted" because she did not think her daughter was lying, but she also did not think that Defendant had done those things.

One day, she picked up the victim from school and drove her home. They sat in the van together, and she asked the victim if "there [was] anything she needed to talk to [her] about." She asked her if "everything [was] okay with [her] and [Defendant]." She testified that the victim appeared "uncomfortable" and "she started to squirm." The victim told her mother that Defendant would "rub her back" and "massage her legs" and "sometimes he would massage her bottom, her butt." The victim began to cry. The victim also told her mother that Defendant "would touch her breasts. And she also said that he would rub her private areas." The victim's mother asked her daughter what she meant by her "private areas," and the victim responded, "What do you think[?]" The victim then explained that she meant "down there" and indicated her vagina. The victim's mother reported the abuse to authorities and took the victim to Our Kids.

Child Protective Services investigator Sundi Blanchard testified that she investigated the abuse allegations in 2000, when the victim was six years old. Ms. Blanchard testified that at the time, she had been employed by the Department of Children's Services for only five months. She found the victim to be "hard to interview." She testified that she believed the victim was being honest. She also interviewed the victim's mother, who also appeared to be honest. Ms. Blanchard concluded that the allegations were "unfounded," meaning that the allegations could not be substantiated.

Detective Amy Dean of the Murfreesboro Police Department testified that in 2006, she conducted a forensic interview of the victim with Donna Larant from the Child Advocacy Center. Detective Dean also interviewed Defendant. She testified that Defendant appeared calm and composed during his interview. She testified that Defendant denied that

he had ever touched the victim in a sexual manner. Detective Dean described Defendant's reaction as "indifferent" when she informed him that the victim had accused him of having touched her in a sexual manner.

Defendant testified on his own behalf. Defendant hired an attorney immediately after the allegations in 2000, and he agreed to meet with the Department of Children's Services. He also voluntarily spoke to a detective.

Defendant repeatedly denied ever having touched the victim in a sexual manner, specifically denying that he had ever digitally penetrated the victim. With regard to the most recent incident, Defendant testified that he had talked with the victim about temporary tattoos the victim had gotten.

Defendant also called several character witnesses to testify on his behalf, including his pastor, his ex-wife, his sister, his daughter, his niece, and other business associates and friends.

## *Analysis*

### I. *Double Jeopardy*

On appeal, Defendant contends that the trial court erred by not granting his motion to dismiss the second, superceding, indictment against him under the theory of double jeopardy, or in the alternative, on the basis of prosecutorial misconduct.

Defendant was originally indicted on four counts of aggravated sexual battery and one count of attempted aggravated sexual battery. At a trial commencing on April 8, 2008, the victim testified that Defendant rubbed her between her legs. She also testified that "he slipped his finger into my private areas. And it went in and it hurt." Defendant requested a jury-out hearing following the victim's testimony of penetration. During the jury-out hearing, the State explained that at the time of the indictment, it did not have evidence of penetration. Defense counsel argued that the State was presenting proof of "another crime for which [Defendant]'s not indicted," and that it was "highly improper" for the victim "to be allowed to testify" that Defendant sexually penetrated her. The trial court agreed with defense counsel and recognized that there was a "problem" because "this is making it appear that he's guilty of rape when he hadn't been charged with rape." The State suggested that any confusion could be clarified by a jury instruction. The State also argued, "we can go back and reindict for an A-felony if he chooses to do that. If we go forward on this, if he's found not guilty or guilty, he can never be charged with an A-felony on these facts because that's been waived by the state." Defense counsel stated, "Fine. Then you indict him on

whatever you choose to." The State informed defense counsel that "for post-conviction purposes" it wanted to make "absolutely clear" that if Defendant received a mistrial, the State would re-indict for rape of a child. The State also intimated that it could re-indict Defendant for the incidents that happened when the victim was six years old. The State argued that defense counsel would have the opportunity to cross-examine the victim as to why she had not testified before the grand jury regarding any penetration. Defense counsel argued that cross-examining the victim on the issue of penetration would only take a "bad situation" and make it "a worse situation." The State responded that, "It can't be worse if there can't be no [sic] conviction on it. Now, if we go back and reindict, there can be a conviction."

Defense counsel argued that Defendant had been prejudiced by the victim's testimony of penetration. The State responded that there was no prejudice to Defendant because he was on trial for a lesser-included offense of aggravated sexual battery. The trial court concluded that Defendant was "definitely prejudiced" by the testimony and granted Defendant's motion for a mistrial.

On the following day, Defendant was indicted for two counts of rape of a child, nine counts of aggravated sexual battery, one count of solicitation of a minor, and one count of attempted sexual battery. Defendant filed a motion to dismiss the indictment under a theory of double jeopardy, or in the alternative, on the basis of prosecutorial misconduct. In an order denying Defendant's motion, the trial court found that Defendant "made a motion for a mistrial presuming a jury would know a 'penetration' is more serious than an illegal touching of a victim's intimate parts. There is no evidence in the record to support such a conclusion." The court also concluded that the State had opposed a mistrial and had not done "anything intentionally to push the defense into making such a request."

The constitutional right against double jeopardy protects against (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. *State v. Beauregard*, 32 S.W.3d 681, 682 (Tenn. 2000). The rule in Tennessee is well settled that constitutional provisions against double jeopardy protect an accused from the peril of a second punishment and a second trial for the same offense. *Whitwell v. State*, 520 S.W.2d 338, 341 (Tenn. 1975); *State v. Taylor*, 912 S.W.2d 183, 185 (Tenn. Crim. App. 1995). "This does not mean, however, that every time a defendant is subjected to a trial before a competent tribunal he is entitled to go free if the trial fails to end in final judgment." *State v. Carter*, 890 S.W.2d 449, 452 (Tenn. Crim. App. 1994) (citations omitted).

One of the recognized exceptions to the prohibition against double jeopardy is when the defendant has actively sought or consented to the mistrial, unless he was "goaded" into

requesting a mistrial. *Taylor*, 912 S.W.2d at 185; *State v. Nixon*, 669 S.W.2d 679, 681 (Tenn. Crim. App. 1983). Another exception exists when there is a "manifest necessity" for a mistrial. *Nixon*, 669 S.W.2d at 681. If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared and a claim of double jeopardy would not prevail to bar a subsequent trial. *State v. Mounce*, 859 S.W.2d 319, 321 (Tenn. 1993); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The issue of whether a retrial shall be allowed must be decided on the circumstances of each case and is within the discretion of the trial judge. The trial judge must weigh the public's right to a fair and complete adjudication against the accused's constitutional right not to be harassed, oppressed by successive trials, or otherwise denied the protection of constitutional rights. *Gori v. United States*, 367 U.S. 364, 81 S. Ct. 1523, 6 L. Ed. 2d 901 (1961). The trial court's factual findings are decisive on appeal unless the evidence preponderates otherwise. *Nixon*, 669 S.W.2d at 681.

We find no evidence in the record to support Defendant's position that he was goaded by the State into requesting a mistrial. In fact, the record shows that the State opposed a mistrial and that the State was in favor of proceeding at the first trial on the lesser indicted charges of aggravated sexual battery and attempted aggravated sexual battery. At the first trial, the State conceded that it had waived the higher offense of rape of a child when it sought an indictment charging aggravated sexual battery. The State did not seek indictment for rape of a child because, at the time, the State had no evidence of penetration to present to the grand jury. We find that Defendant actively sought a mistrial in the first trial, and we find no evidence that the State goaded Defendant into such request. Defendant is not entitled to relief on this issue.

Alternatively, Defendant argues that the State acted with vindictiveness, rising to the level of prosecutorial misconduct, when it charged Defendant in the superceding indictment with additional offenses, including the greater offense of rape of a child. Defendant relies on numerous statements by the Assistant District Attorney General at the first trial that the State could "go back and indict for an A-felony."

The Tennessee Supreme Court has held that there is a rebuttable presumption of prosecutorial vindictiveness that may arise if the circumstances pose a "realistic likelihood" of prosecutorial retaliation. *State v. Phipps*, 959 S.W.2d 538, 546 (Tenn. 1997). In *Phipps*, the State did not seek the death penalty at the defendant's initial trial for first degree murder. *Id*. at 539. The trial court sentenced Phipps to life imprisonment. The defendant was successful on appeal, and on remand for a new trial, the State filed a notice of its intent to seek the death penalty. *Id*. The defendant filed a motion to strike the notice, and the State

asserted that new evidence established aggravating circumstances. The trial court granted the motion, thereby barring the State from seeking the death penalty on retrial, and this court affirmed that decision on appeal. *Id*. at 540.

On appeal, the supreme court held that the pursuit of the death penalty on remand invoked a rebuttable presumption of prosecutorial vindictiveness. *Id*. at 547. The court remanded the case to the trial court for a hearing to provide the State the opportunity to present proof to overcome the presumption of prosecutorial vindictiveness. The court established the following criteria for evaluating claims of prosecutorial retaliation:

> (1) Whether the right asserted by the defendant would result in duplicable expenditures of prosecutorial resources;
> (2) whether the prosecution would be required to do over again what it thought it had already done correctly once;
> (3) whether the prosecutor has a personal stake or an interest to self-vindication;
> (4) whether institutional biases militated against retrial of a decided question; and
> (5) whether the prosecutorial decision to increase the sentence was made after the initial trial.

*Id*. at 546. The court held that if circumstances "give rise to a realistic likelihood of prosecutorial retaliation[,]" the State must establish, by clear and convincing evidence, that a legitimate purpose motivated the challenged decision. *Id*.

In its brief, the State relies upon *State v. Frank Michael Vukelich*, No. M1999-00618-CCA-R3-CD, 2001 WL 1044617 (Tenn. Crim. App. Sept. 11, 2001), *perm. app. denied* (Tenn. Apr. 1, 2002). In that case, the State originally indicted the defendant for conspiracy to delivery over 700 pounds of marijuana and three counts of money-laundering. *Id*. at *5. After the first trial resulted in a mistrial due to a hung jury, the State indicted the defendant on the original counts plus five new counts of money-laundering based on a witness's testimony during the first trial. *Id*. This court concluded that the circumstances of the case showed that the prosecutor had no interest in self-vindication, and no institutional biases militated against retrial of a decided question, because the defendant was to be tried again anyway. *Id*. at *9. This court found that even though the addition of new money laundering counts came after the first trial, the trial was not "completed" because it resulted in a mistrial. Based on the incompleteness of the first trial, this court concluded that the presumption of prosecutorial vindictiveness did not apply. *Id*.

Defendant argues that the State gained an advantage by the trial court's grant of a mistrial in that the State was subsequently able to indict for additional offenses, as well as the greater offense of rape of a child. Defendant further asserts that the State gained this advantage by "intentionally introducing improper evidence," being evidence of penetration. We disagree. The record shows that the State made it clear to Defendant and the trial court that it did not initially indict for rape of a child because there was very little evidence of penetration. According to the State's written response to Defendant's motion to dismiss the superceding indictment, the State had provided Defendant with pretrial discovery responses which included the report from Our Kids in which the victim stated, "He didn't really go inside my private, well maybe one time he did, but mostly he would rub my back and legs." The State's response also asserts,

> The State in no way wished to lose this jury and did not want to have to put the victim through a second trial even if it were possible to convict the defendant for rape of a child which carries a sentence of 25 years at 100%[,] nearly twice the sentence of the charge for which he was indicted.
>
> . . . .
>
> At the time the first indictment was drawn, the victim was very withdrawn and embarrassed. She was unable to speak freely with the State to explain each and every contingency within each and every act alleged. The State being unable to gauge the victim's testimony in a room full of people including the Defendant and his family, made the decision to charge the lesser of aggravated sexual battery for which the evidence was clear. Furthermore, it is always the State's objective in child sex abuse cases where a minor victim would have to testify against a Defendant to settle the case without a trial if possible.

It was the victim's testimony at the first trial which provided the basis for the subsequent indictment on additional and greater charges. Similar to the facts in *Vukelich*, the trial in this case was not complete, and the subsequent charges were based on testimony from the first trial. In the case at bar, the victim was the only witness to testify at the first trial, and there are only 28 pages of transcript of her testimony, before defense counsel objected and moved for a mistrial. The trial had barely begun. Applying the *Phipps* factors, we believe that the State has overcome any presumption of prosecutorial vindictiveness. Because the first trial did not reach a conclusion, prosecutorial resources were not duplicated, nor was the prosecution required to "do over again what it thought it had already correctly done once," nor do we believe that the prosecutor had a personal stake or an

interest in self-vindication. 959 S.W.2d at 546. Defendant is not entitled to relief on this issue.

## II. *Relevance of the Evidence*

Next, Defendant contends that the trial court erred by refusing to allow testimony that the victim masturbated finding that such evidence was not relevant to the charges against Defendant.

In a jury-out hearing at trial, defense counsel examined the victim's mother about the victim's acts of masturbation in an attempt to introduce evidence of instances of sexual conduct by a victim pursuant to Rule 412 of the Tennessee Rules of Evidence. The victim's mother testified that her daughter had a history of "rubbing" herself. She preferred not to use the word, "masturbation." She testified that she and the victim's father separated when the victim was one year old. At that time, she noticed that the victim would lie on the floor and "rub on her white blanket." The victim's father asked her about it, and she told him that it was "normal." The victim's mother had reported the "rubbing" at the 2001 evaluation by Our Kids.

The victim's mother testified that she did not remember at what age the victim stopped rubbing herself. She never saw the victim rub herself in Defendant's presence, and she never saw Defendant remove the victim's hand and tell her to stop. She never saw the victim sit on Defendant's lap or leg and "bounc[e] or . . . rotat[e] back and forth," nor did she see Defendant remove the victim "from his leg."

The victim's mother brought up the "rubbing" conduct with the victim's pediatrician. The doctor told the victim's mother that it was normal behavior, and she was told to "simply tell her to stop" or tell her to go to her room when she saw her doing it. The victim's mother did not want to make a "big deal" out of it, and she did not want to embarrass her daughter. She testified that she never saw the victim use her hands when she was rubbing.

The trial court found that this evidence was not relevant and held that Defendant would not be allowed to testify about those incidents. Defense counsel stated that he anticipated asking Defendant about an occasion when the victim sat on Defendant's leg and rocked back and forth and Defendant removed her from his leg. Defense counsel argued that the evidence was relevant to show Defendant's "love" and "concern" for the victim. The court denied Defendant's request to introduce such evidence, concluding that "[e]ven if it [was] relevant under Rule 403, I think it's so misleading and confusing to the jury I'm not going to allow it."

In another jury-out hearing, Defendant made the following offer of proof. Defendant testified that the victim's behavior was "overt" and "observed by lots of different people." Defendant believed it was "abnormal" and asked the victim's mother to discuss it with the victim's pediatrician. Defendant testified that on one occasion, the victim sat on his lap and began "rub[bing] herself." Defendant took her off his lap and told her not to do that. The trial court again concluded that this evidence was not relevant and would likely mislead and confuse the jury.

Tennessee Rule of Evidence 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. It is a rule of relevance, *see State v. Brown*, 29 S.W.3d 427, 430 (Tenn.2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn.1997).

Rule 412 provides, in pertinent part, as follows:

(c) Specific instances of conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

(1) Required by the Tennessee of United States Constitution, or
(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
(3) If the sexual behavior was with the accused, on the issue of consent, or
(4) If the sexual behavior was with persons other than the accused,

(i) to rebut or explain scientific or medical evidence, or
(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c)(4).

Even if one of the above considerations is satisfied, the trial court must nevertheless conclude that the probative value of the evidence outweighs its unfair prejudice to the victim. *See id*. 412(d)(4). "As with other evidentiary rulings, the admissibility of the evidence [pursuant to Rule 412] rests in the discretion of the trial court." *Sheline*, 955 S.W.2d at 46.

Defendant asserts that the evidence offered was relevant as to the victim's credibility and tended to prove that he was, in fact, "protective of the victim, as opposed to being a sexual predator, as alleged by the state." Defendant concedes that evidence of the victim's behavior was not intended to demonstrate consent, but rather to show that Defendant attempted to "to act in the child's best interest and welfare." Defendant acknowledges that the proffered evidence does not fall under any of the provisions of Rule 412, but asserts that his Sixth Amendment right to confront witnesses was abridged. This argument is without merit. Our supreme court has stated,

> Although "[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process." Specifically, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."

*State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)).

Moreover, Defendant's assertion of a violation of his Sixth Amendment right to confrontation is misplaced because he was not prevented from cross-examining the victim, but rather from introducing substantive evidence, which the trial court determined, and we agree, is not relevant. We conclude that the proffered evidence that the victim masturbated does not fall within any of categories of evidence permitted under Rule 412, and the trial court did not abuse its discretion in excluding the evidence. Defendant is not entitled to relief on this issue.

III.    *Evidence of Venue*

Defendant asserts that the State failed to establish that the charges against Defendant in Counts 5 and 7 occurred in Rutherford County. Counts 5 and 7 of the indictment both charged Defendant with aggravated sexual battery, and in both counts, the victim was a passenger in a vehicle being driven by Defendant.

An accused is entitled to a trial in the county where the offense was committed. *State v. Marbury*, 908 S.W.2d 405, 407 (Tenn. Crim. App. 1995). The burden is on the State to prove that the offense was committed in the county specified in the indictment. *Id*. at 407. Venue is not an element of the offense which must be proved beyond a reasonable doubt; it is a jurisdictional fact which must be proved by a preponderance of the evidence. Tenn. Code Ann. § 39-11-201(e); *State v. Hutcherson*, 790 S.W.2d 532, 533 (Tenn. 1990); *State v. Smith*, 926 S.W.2d 267, 269 (Tenn. Crim. App. 1995).

The victim testified that both incidents, in Counts 5 and 7, happened while she was riding in a vehicle being driven by Defendant. As to Count 5, the victim did not testify as to a specific location where the incident occurred. As to Count 7, the victim testified that Defendant was taking her to cheerleading practice, and the incident occurred while they were stopped at a tobacco store. Defendant testified that he drove the victim to various sports and extracurricular activities "on occasion," and that he "only remember[s] going to one [cheerleading competition] that was in Nashville."

The State argues that venue was sufficiently established through testimony by the victim that she lived in Rutherford County and that the incidents involving Defendant took place in Rutherford County. We agree. That testimony by the victim is sufficient to prove venue by a preponderance of the evidence. A jury could reasonably conclude, from the entire proof, that the incidents occurred in Rutherford County. Defendant's testimony that he recalled going to a cheer competition in Nashville (which is in Davidson County) alone is not sufficient to controvert the other evidence of venue in this case. Defendant is not entitled to relief on this issue.

IV.     *Sufficiency of the Evidence*

Defendant asserts that the evidence was insufficient to support his conviction for rape of a child as alleged in Count 1. Specifically, Defendant argues that there was insufficient evidence of penetration. We note that Defendant was also charged in Count 2 with rape of a child but was convicted of the lesser-included offense of attempted rape of a child. Defendant does not challenge his conviction in Count 2.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim.

App. 1995). Nor may this court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Defendant challenges his conviction in Count 1, rape of a child. Rape of a child is the unlawful sexual penetration of a victim by the defendant when the victim is more than three years of age but less than 13 years of age. Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" is defined as any intrusion "however slight, of any part of a person's body . . . into the genital . . . openings of the victim's . . . body." Tenn. Code Ann. § 39-13-501(7).

Defendant contends that the victim's testimony was inconsistent. In his brief, Defendant cites testimony by the victim about incidents other than the incident that is the basis of Count 1, asserting that "it is difficult to determine which specific portion of her testimony related to each count of the indictment." Defendant also argues that there was no evidence to corroborate the allegation of penetration. He points to the medical evidence, or lack thereof, of any physical trauma to the victim.

We do not find inconsistencies in the victim's testimony. We note that the victim gave testimony regarding each incident as they occurred in chronological order, which did not coincide with the order of the counts in the indictment. However, as to Count 1, the victim testified that around the beginning of her seventh grade year, when she was 12 years old, Defendant put his hand down her shorts and stuck his finger into her vagina. She testified that it "hurt a lot when that happened." She also testified that it was the "worst time" because she felt "very violated." The victim distinguished between the incidents of Counts 1 and 2, testifying that on one occasion, Defendant digitally penetrated her. With respect to Count 2, the victim testified that Defendant "tried to stick his finger into [her] vagina and it didn't hurt that time." That incident occurred before Count 1, where Defendant "did stick his finger into [her] vagina."

We note that our supreme court has held that the testimony of a child victim, alone, is sufficient to uphold a conviction for rape of a child. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003). Taken in a light most favorable to the prosecution, we find that the evidence is sufficient to support Defendant's conviction for rape of a child. This issue is without merit.

**CONCLUSION**

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE